IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2019 MAY 23  AM 10: 58

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | | |
|---|---|---|
| EMPOWER TEXANS, INC., BRANDON C. | § | |
| WALTENS, AND DESTIN R. SENSKY, | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| CHARLIE L. GEREN, IN HIS OFFICIAL | § | CAUSE NO. 1:19-CV-422-LY |
| CAPACITY AS CHAIRMAN OF THE | § | |
| COMMITTEE ON HOUSE | § | |
| ADMINISTRATION OF THE TEXAS | § | |
| HOUSE OF REPRESENTATIVES, | § | |
| DEFENDANT. | § | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO DISMISS**

Before the court in the above-styled and numbered cause are Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction filed May 16, 2019 (Dkt. No. 8),

Defendant's Motion to Dismiss Plaintiff's First Amended Complaint filed May 16, 2019 (Dkt.

No. 11), Plaintiffs' Response to Defendant's Motion to Dismiss Plaintiffs' First Amended

Complaint filed May 16, 2019 (Dkt. No. 12), Defendant's Opposed Motion to Stay Pending

Resolution of Defendant's Motion to Dismiss Based on Legislative Immunity filed May 17, 2019

(Dkt. No. 13), Plaintiffs' Response to Defendant's Opposed Motion to Stay Pending Resolution

of Defendant's Motion to Dismiss Based on Legislative Immunity filed May 20, 2019 (Dkt. No.

17), and Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order and

Preliminary Injunction filed May 21, 2019 (Dkt. No. 19).  On May 22, 2019, the court held a

hearing on the motions at which all parties were represented by counsel.  Having considered the

motions, responses, attachments to all pleadings, the exhibits presented at the hearing, the

applicable law, and the arguments of counsel, the court will grant the motion to dismiss for the

reasons to follow.

## I.    BACKGROUND

At the opening of the 86th Legislative Session, the Texas House of Representatives unanimously passed House Rule 5, which restricts the issuance of media credentials and the accompanying right to sit in the press seating area on the House floor to an employee of a news organization determined to be "principally a general news organization" whose "publications . . . are editorially independent of any group . . . that lobbies the government or that is not principally a general news organization." Tex. H.R. 5, §20, 86th Leg., R.S. (2019).  On January 29, 2019, the House granted Defendant Charlie L. Geren ("Geren"), Chairman of the Committee on House Administration the authority to act on the Committee's behalf in matters involving the management of House facilities, coordination with House support personnel, and general enforcement of the House policies and procedures.  The Committee on House Administration is tasked under the House Rules "with jurisdiction over . . . administrative operation of the house and its employees . . . [and] all admissions to the floor during sessions of the house."  Tex. H.R. 3, §16, 86th Leg., R.S. (2019).  In that capacity, the Committee receives applications from media representatives and issues pass cards to qualifying applicants for purposes of access to the press area on the floor of the House, while the House is in session.

Plaintiff Empower Texans, Inc. ("Empower Texans") publishes a variety of news products, including the Texas Scorecard, a news magazine published in print to subscribers across Texas on a bi-weekly basis during sessions of the Texas Legislature and monthly during the interims.  Texas Scorecard articles are also published online on a daily basis, as a weekly email digest, and on social media through the Empower Texans Facebook page, which has over 202,700 followers.  This is no small number, Empower Texans contends, because it is more

followers than all but four of Texas's largest daily newspapers. Empower Texans also produces a variety of other news products, including a weekly radio program, a weekly online video broadcast, and a daily email news digest.

Empower Texans characterizes its relationship with Geren as antagonistic. Occasionally, the dispute has spilled into the public eye on social media, as when Geren tweets aggressively at employees of Empower Texans. Empower Texans posits Geren's distaste stems from Empower Texans' endorsements of Geren's challengers in Republican primaries, as well as Empower Texans' grading of Geren's performance on the organization's Fiscal Responsibility Index.

On January 3, 2019, Plaintiffs Brandon C. Waltens and Destin R. Sensky, reporters for Empower Texans, each submitted media-credentials applications to the Texas House and Texas Senate. A media credential would allow Waltens and Sensky to access the press area on the floor of the House, near the Speaker's dais, as well as access to the area around the rail surrounding members' desks. Empower Texans' claims the press area provides a superior vantage point than that available from the public gallery. The press area also provides a superior auditory advantage: it allows reporters to listen to side conversations between members. The Senate, which has a different standard for press credentials than the House, immediately issued credentials to Waltens and Sensky. On January 4, 2019, Geren sent letters to Waltens and Sensky informing them that their applications for media credentials were denied, because Texas Scorecard is associated with an organization that advocates for matters before the Legislature.[1] More specifically, Geren wrote:

> It is [sic] has come to my attention that the organization you are employed by,
> Texas Scorecard, has a close association with a general-purpose political

---

[1] The press credentials were requested by Waltens and Sensky individually, and Geren's letters were sent to them individually. For simplicity, the court will refer to the requests jointly as press credentials for Empower Texans. Additionally, because the interests of Plaintiffs do not diverge, they will be referred to collectively as "Empower Texans," except as needed for clarity.

committee (GPAC) and that the organization's website prominently display advocacy on policy matters before the legislature. Based on this information, I believe that you are not eligible for a media credential.

Geren explained that eligibility for a news-media credential is determined in accordance with House Rule 5. Geren remarked that, "[a]ccording to records available on the Texas Ethics Commission website, a GPAC with the name Empower Texans PAC is located at the same address given for your employer." Based on this information, Geren surmised that "Texas Scorecard is not an entity 'whose publication or operations are editorially independent of any institution, foundation, or interest group that lobbies the government or that is not principally a general news organization.'" Geren concluded that "it is my determination that you are not eligible for a news media credential based on Rule 5." Geren ended the letter with the following: "[i]f you believe this determination has been made in error, please feel free to provide me with any additional information you feel is relevant to the determination."

Empower Texans claims Geren's letter—down to the typos—matches a 2017 letter denying media credentials to employees of Empower Texans. In 2017, Empower Texans was denied media credentials, in part, because the presence of a "GPAC located at Empower Texans' address." Empower Texans alleges that the facts changed between 2017 and 2019. Importantly, Empower Texans claims that when Geren sent the January 2019 letter, Empower Texans PAC was registered with the Texas Ethics Commission at an address in Cove, Texas that was not associated with Empower Texans. Empower Texans surmises that Geren's use of an outdated address as the reason for denying press credentials is evidence of Geren's bad faith and proof of a pretense to cover for his viewpoint discrimination against Empower Texans.

A several-month back-and-forth ensued between Empower Texans and the House Business Office. In response to a letter sent by Empower Texans, on February 26, 2019, the

4

Business Office wrote the following information potentially indicating that Empower Texans' applications were still under review:

> To process their applications, I need additional information to verify their eligibility under Rule 5 Section 20 of the Rules of the Texas House. Can you please provide me with information sufficient to verify that Empower Texans Inc. d/b/a Texas Scorecard is editorially independent of any institution, foundation, or interest group that lobbies the government or is not principally a general news organization?

Empower Texans followed up with several letters, including information on Empower Texans' status and the organization's concerns about the breadth of House Rule 5.  Empower Texans also sought to clarify whether their applications for media credentials had been denied or were still being processed.  Empower Texans contends that the Business Office never provided a meaningful response to its letters.

Empower Texans commenced this lawsuit on April 16, 2019.  In an amended complaint filed May 14, 2019, Empower Texans sues Geren in his official capacity under Section 1983[2] and the Declaratory Judgment Act.  *See* 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202.  Empower Texans makes two claims: (1) Geren engaged in viewpoint discrimination in violation of the First Amendment when he refused to grant Empower Texans a House press credential; (2) Geren violated Empower Texans' procedural due process by not following the procedures in the House rules for issuing or denying press credentials.  On May 16, 2019—with the Texas legislative session poised to end in nine days—Empower Texans moved for a temporary restraining order and preliminary injunction enjoining Geren from denying Empower Texans access to the floor of the House for the remainder of session.  Empower Texans also seeks an order requiring Geren to issue House press credentials to Empower Texans.

---

[2] Congress passed Section 1983 of Title 42 of the United States Code in 1871, which entitles an injured person to relief if a state official violates his or her constitutional rights.

Geren responded on May 16, 2019, with a motion to dismiss Empower Texans' action. *See* Fed. R. Civ. P. 12(b)(1), (6). Geren argues that the doctrine of absolute legislative immunity requires immediate dismissal of this action, because Geren is immune from suit for any press-credential decisions made under the House Rules. Thus, any consideration of the merits of Empower Texans' claims or the constitutionality of Geren's actions would be an impermissible encroachment on the Texas Legislature. Geren also moves to stay consideration of the emergency relief requested by Empower Texans until this court resolves Geren's claim of legislative immunity.[3] Because prevailing on the legislative-immunity claim would require dismissal of this action, the court first considers that claim. *See e.g., Reeder v. Madigan*, 780 F.3d 799 (7th Cir. 2015) (affirming dismissal of claims where defendants were entitled to legislative immunity); *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 635 (1st Cir. 1995) ("[T]he doctrine of absolute legislative immunity requires that the federal courts refuse to entertain the suit."); *Consumer's Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975) (reversing and remanding case "with direction for its dismissal as one not justiciable by reason of the textually demonstrable commitment of such rules to the legislative branch of government and in view of immunity conferred by the Speech or Debate Clause of the Constitution").[4]

---

[3] Because of the few remaining days in the Regular Session of the 86th Legislature, the court **DENIES** Geren's motion to stay (Dkt. No. 13) and entertains argument on both Plaintiffs' request for emergency relief and Defendant's motion to dismiss.

[4] The standards for considering a motion to dismiss are well established and will not be repeated here.

## II.   LEGISLATIVE IMMUNITY

State legislators are entitled to "absolute immunity from civil liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 46 (1998).   Legislative immunity protects members of Congress through the Speech and Debate Clause, U.S. Const. art. I., § 6, cl. 1, and state legislators through a federal common-law immunity.   *See Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980) (citing *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)) ("[W]e generally have equated the legislative immunity to which state legislators are entitled under [Section] 1983 to that accorded Congressmen under the Constitution."). In *Tenney*, the Court "concluded that Congress did not intend [Section] 1983 to abrogate the common-law immunity of state legislators." *Id.*  The Supreme Court extended *Tenney*'s holding to apply to "[Section] 1983 actions seeking declaratory or injunctive relief." *Supreme Court of Va.*, 341 U.S. at 732.  As the Court has relied on its Speech or Debate Clause jurisprudence as guidance in applying legislative immunity to state legislators, this court does the same in analyzing Geren's claim of legislative immunity.

The purpose of legislative immunity "is to insure that the legislative function may be performed independently without fear of outside interference." *Id.*  In order to serve this purpose, legislative immunity applies "broadly" to protect individual legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Id.* (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)).  That is because "a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Id.* (quoting *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503 (1975)).  The Supreme Court has said that legislative immunity should be interpreted "broadly," *Eastland*, 421 U.S. at

7

501, with an eye toward "a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979).

Though "[t]he heart of the Clause is speech or debate in either House," immunity extends to protect matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation." *Gravel v. United States*, 408 U.S. 606, 625 (1972). Whether an activity is legislative and therefore subject to absolute legislative immunity turns on the nature of the act itself. *Bogan*, 523 U.S. at 54–55. Thus, legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity," *Tenney*, 341 U.S. at 376, and "acts that occur in the regular course of the legislative process." *United States v. Brewster*, 408 U.S. 501, 525 (1972). Immunity does not attach where a legislators actions are "casually or incidentally related to legislative affairs," *id.* at 528, or which fall outside the "legitimate legislative sphere." *Eastland*, 421 U.S. at 503.

Speech or Debate Clause jurisprudence demonstrates that a legislator's acts qualify as legitimate legislative activity where, as here, those acts are "part of the legislative process itself" and directed toward the internal workings of the legislative process. *Brewster*, 408 U.S. at 528. The Supreme Court has concluded that voting on a resolution or legislation falls squarely within the scope of absolute legislative immunity. *See Bogan*, 523 U.S. 44; *Powell v. McCormack*, 395 U.S. 486 (1969); *Kilbourn v. Thompson*, 103 U.S. 168 (1880). It similarly concluded that making a speech on the House floor or speaking in a committee hearing qualifies as a legislative act. *See United States v. Johnson*, 383 U.S. 169 (1966); *Tenney*, 341 U.S. 367. The Court has countenanced activities outside the narrow confines of legislative debate and voting, such as preparing a committee report or issuing a subpoena for records as part of a legislative

8

investigation. *See Doe v. McMillan*, 412 U.S. 306 (1973); *Dombrowski*, 387 U.S. 82.  In each case, the Court recognized that absolute immunity attached to the legislator's conduct because that conduct was part of the deliberative process leading to the consideration of legislative action.

The First and Seventh Circuits have considered state rules governing floor access in state legislatures. *See Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622 (1st Cir. 1995); *Reeder v. Madigan*, 780 F.3d 799, 804 (7th Cir. 2015).  And the District of Columbia Circuit has considered the issue of press access on the floor of the United States Congress. *See Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1349 (D.C. Cir. 1975).  All three courts concluded that denying access to the floor is a legislative act subject to absolute immunity; the First and Seventh Circuits concluded that legislative immunity applied to the promulgation and application of such rules.  *Consumers Union*, 515 F.2d 1341; *Harwood*, 69 F.3d 622; *Reeder*, 780 F.3d 799.

In *Harwood*, a group of private, non-profit organizations sued the speaker of the Rhode Island House of Representatives.  69 F.3d at 625–26, 634.  The organizations mounted a facial and as-applied challenge to a House rule purporting to ban lobbyists from the floor of the House while the House was in session.  *Id.*  The court first held that "it is beyond serious dispute that enforcing a duly enacted legislative rule which prohibits lobbying on the House floor during House sessions is well within the legislative sphere." *Id.* at 632. That is because "[s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting." *Id.*  The court reasoned that "[a] rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members)

in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity." *Id.* The court concluded that "regulation of admission to the House floor comprises 'an integral part of the deliberative and communicative processes by which Members participate in . . . House proceedings with respect to the consideration and passage or rejection of proposed legislation.'" *Id.* (quoting *Gravel*, 408 U.S. at 625).

The court also rejected the as-applied challenge to the rule under the First and Fourteenth Amendments. The court analogized the as-applied challenge to arguments made and rejected by the Supreme Court in *Eastland*. In *Eastland*, plaintiffs argued that "'once it is alleged that First Amendment rights may be infringed by congressional action the Judiciary may intervene to protect [First Amendment] rights.'" *Id.* (quoting *Eastland*, 421 U.S. at 509–10). However "the Supreme Court flatly rejected" this argument, warning that "such an exception "'ignores the absolute nature of the speech or debate protection and [the] cases which have broadly construed that protection.'" *Id.* The Court in *Eastland* concluded that "[w]here we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, [First Amendment] balancing plays no part." 421 U.S. at 510 n.16.

In *Reeder v. Madigan*, 780 F.3d 799 (7th Cir. 2015), a journalist associated with a lobbying group sued members of the Illinois house after being denied media credentials due to his organization's affiliation with lobbyists. *Id.* at 800–01. Illinois, like many other state legislatures, does not allow anyone associated with a lobbying organization access to the floor. *Id.* at 801. The court rejected the argument "that the action to deny media credentials was administrative in nature," and instead concluded that "the decision whether to confer media credentials on an applicant—was legislative in nature, and integrally so." *Id.* at 803. The court

reasoned that the rules excluding individuals associated with lobbyists from the press boxes are "designed to avoid the impairment of deliberations there," because "it can easily be inferred . . . that the legislature believes that the presence of lobbyists risks an impairment of deliberations." *Id.* The court added, "[i]t is hardly a stretch to characterize control of access to the legislative floor as a core legislative function." *Id.* "A contrary rule would make it nearly impossible for a legislature to function, as it would potentially subject legislators and their aides to liability for every floor-access decision they make." *Id.* at 804.

In *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, Consumer Reports magazine was denied access to Congress's Periodical Press Galleries based upon rules of the Senate and House. 515 F.2d 1341, 1344–45 (D.C. Cir. 1975). The purpose of the rules, the court observed, was to protect legislators' independence by assuring the press galleries were used by reporters rather than "lobbying or advocacy groups." *Id.* at 1347. The court concluded that the denial of a press pass fell "within the spheres of legislative power committed to the Congress and the legislative immunity granted by the Constitution." *Id.* at 1351.

### III.   APPLICATION

The first issue before this court is whether the House's rule governing access to the press area on the floor of the House while the House is in session is an integral part of the communicative and deliberative processes of the House and shielded from challenge by legislative immunity.   House Rule 5 restricts the issuance of media credentials and the accompanying right to sit on the House floor to employees of an editorially-independent entity that is "principally a general news organization."   House Rule 5 is "part of the legislative process," designed to protect the integrity of the legislative process more broadly by preventing

those not associated with a general news organization from accessing the floor of the House during deliberations. A rule restricting access to the House floor and to the railing surrounding members' desks "necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.*, debating and voting," and "comprises 'an integral part of the deliberative and communicative processes.'" *Harwood*, 69 F.3d at 632 (quoting *Gravel*, 408 U.S. at 625). The doctrine of legislative immunity applies to the promulgation of House Rule 5, and Empower Texans' facial challenge to the language of House Rule 5 is barred by legislative immunity.

Empower Texans also challenges the application of House Rule 5 to it, claiming that Geren engaged in viewpoint discrimination when Geren denied Empower Texans' application for press credentials.[5] Empower Texans primarily contends that legislative immunity does not protect "administrative acts," and thus legislative immunity cannot bar its as-applied claim. Empower Texans asserts that the Fifth Circuit has adopted two tests as guidelines for when an act is legislative as opposed to administrative. *See Bryan v. City of Madison, Miss.*, 213 F.3d 267, 273 (5th Cir. 2000).

In *Bryan*, the court evaluated a series of actions by local officials—the mayor, city council, and alderman—that were alleged to have thwarted a proposed apartment development in a constitutionally significant way. 213 F.3d at 273. The city officials invoked the doctrine of legislative immunity. The court surveyed cases considering legislative immunity in the context

---

[5] Empower Texans contends that Geren has not conclusively denied the requested press credentials. Geren's January 4, 2019 letter states "it is my determination that you are not eligible for a news media credential based on Rule 5." However, the letter was written before the 86th Legislature convened. Empower Texans has unsuccessfully attempted to resolve the dispute through the House Business Office. This places at issue the question of whether there is an actual case or controversy in the absence of an unequivocal denial. The fact remains, however, that the credentials have not been issued, in spite of a timely request having been made. For purposes of this order, the court presumes without deciding that the request has been denied.

of local approval of residential or commercial developments, and summarized the First Circuit's test for determining legislative immunity in the zoning context:

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are "legislative facts," such as "generalizations concerning a policy or state of affairs," then the decision is legislative. If the facts used in the decision making are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the "particularity of the impact of the state action." If the action involves establishment of a general policy, it is legislative; if the action single[s] out specific individuals and affect[s] them differently from others, it is administrative.

*Id.* at 273 (citing *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)). "Applying the same guidelines to the present case indicates that legislative immunity protects only one of the defendants' listed activities." *Id.* The court, however "'did not choose any one of [the] particular standards . . . but instead used them as general guidelines.'" *Craig v. Police Jury Grant Par.*, 265 F. App'x 185, 191 (5th Cir. 2008) (unpublished) (quoting *Bryan*, 213 F.3d at 273). Based on the general guidelines found in *Bryan*, Empower Texans argues that "the determinations of which individuals are or are not granted access under a media credentials policy—is obviously an administrative act entitled only to qualified immunity because it uses specific facts in decision-making and singles out specific individuals for differential treatment."

   This court does not view the guidelines applied in *Bryan* as providing guidance to the facts of this case. The court emphasized that it was not adopting the test *Cutting* used in the local zoning context as *the* test for legislative immunity, but rather "us[ing] the [test] as general guidelines" in a factually analogous case. *Bryan*, 213 F.3d at 273. The court has not applied the *Cutting* test outside of the context of local legislative immunity; nor has it determined that guidelines adopted for local legislative immunity would be adequate for determining whether the acts of a state legislator are shielded by legislative immunity. In fact, the court has declined to apply such guidelines when it felt they were ill-suited to the case at hand. *See Craig*, 265 F.

App'x at 191 (declining to apply *Bryan* guidelines to determine whether police jury is entitled to legislative immunity and instead looking to "specific holdings from the Supreme Court's and this Circuit's precedents" as more helpful in its legislative-immunity determination).

Empower Texans argues that Geren's action does not involve the determination of a policy, but rather is directed at Waltens and Sensky alone, and thus is not a legislative act. *See Bryan*, 213 F.3d at 273–74. This court disagrees. The legislative policy is ensuring that the legislative function may be performed independently. That policy manifests itself in this particular instance in the action involving Waltens and Sensky, but the policy applies to all.

A rule controlling those who have access to the press area on the House floor and the railing surrounding members' desks "necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.*, debating and voting," and "comprises 'an integral part of the deliberative and communicative processes.'" *Harwood*, 69 F.3d at 632 (quoting *Gravel*, 408 U.S. at 625). Legislative immunity protecting the promulgation of floor-access rules would be of little import if every application of the rule would open legislators to suit. "If that were the rule, legislative immunity would be little more than a rumor, and the Speech or Debate Clause would be easily skirted." *Harwood*, 69 F.3d at 633–34. And legislative functions that the Supreme Court has previously protected under legislative immunity as integral to the legislative process—such as voting, deliberating, speechmaking, or conducting an investigation—would be greatly impeded if a legislative body could not apply rules protecting those processes without being subject to suit. This court concludes that the particular application of House Rule 5 is—like the rule itself—integral to the House's control of its own deliberative and communicative processes and protected by legislative immunity.

Empower Texans next argues that the Court in *Supreme Court of Virginia* adopted the standard that enforcement of a rule is not a legislative action. The Court "made no such pronouncement." *Reeder*, 780 F.3d at 805; *see also Harwood*, 69 F.3d at 633–34 ("[T]he Court has never suggested, much less held, that the enforcement of a rule adopted by an entire legislative body designed to govern the conduct of legislative proceedings falls within [the] exception" for "the exercise by legislators of *punitive* enforcement authority outside the ambit of purely legislative proceedings.").

Empower Texans also argues that *Consumers Union*, *Harwood*, and *Reeder* are readily distinguishable from this case because no allegations were made that the legislators acted in bad faith in refusing to issue a press pass. The Supreme Court has consistently stated that "the motive or intent of the official" is irrelevant when considering the application of legislative immunity. *Bogan*, 523 U.S. at 54 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); *see also Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."). As the Court presciently remarked in 1951, legislators and legislative committees:

> have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.

*Tenney*, 341 U.S. at 377–78 (holding that the legislative official in *Tenney* acted in a legislative capacity even though he allegedly singled out the plaintiff for investigation in order "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights").

## IV.   CONCLUSION

Legislative immunity protects legislatures and legislators in establishing and applying rules that they deem most conducive to conducting legislative business.  House Rule 5, which regulates who may access the press area on the floor of the House and the railing around the members' desks during deliberations, necessarily affects the manner, tenor, and nature of those deliberations.  House Rule 5's application, necessarily plays an integral role in ensuring that the core legislative functions—such as debating, voting, speech making, and the deliberative process itself—are not disrupted by those who have a stake in advocating for the very legislation being deliberated on the floor.   Geren is entitled to absolute legislative immunity from suit, and Empower Texans' claims must be dismissed without consideration of the merits of Empower Texans' underlying claims.

*Absolute* legislative immunity—as the name suggests and as applied by the Supreme Court—sweeps quite broadly, and it can be read to protect a great deal of behavior that is "part and parcel" of the legislative process.  *Gravel*, 408 U.S. at 626.  The broad sweep of such immunity makes it all the more important that legislatures and legislators comport themselves in a manner worthy of the trust placed in them; and whenever possible, without acting in a way that might give rise to an imprimatur of unconstitutional or vindictive conduct.[6]

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint filed May 16, 2019 (Dkt. No. 11) is **GRANTED**.

---

[6]  The issues before this court have been presented in the context of absolute legislative immunity.  Broader issues are present here.  Should a United States District Court interfere with the internal operating procedures of a legislature of a sovereign state, or should the court refrain from doing so under the doctrine of separation of powers or federalism as applied to the relationship between the states and the federal republic or both?  The court leaves these questions unanswered.

**IT IS FURTHER ORDERED** that Empower Texans, Inc., Brandon C. Waltens, and Destin R. Sensky claims against Charlie L. Geren, in his official capacity as Chairman of the Committee on House Administration of the Texas House of Representatives are **DISMISSED** with prejudice as barred by legislative immunity.

In light of the above, the court does not reach Plaintiffs' requests for emergency relief.

SIGNED this _____ day of May, 2019.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

17